[No. H006961. Sixth Dist. June 17, 1991.]

LICK MILL CREEK APARTMENTS et al., Plaintiffs and
Appellants, v.
CHICAGO TITLE INSURANCE COMPANY et al., Defendants and
Respondents

## COUNSEL

Hetland & Hansen, Charles A. Hansen and Steven M. Morger for Plaintiffs and Appellants.

Miller, Starr & Regalia, Edmund L. Regalia and Gary E. Rosenberg for Defendants and Respondents.

Tobin & Tobin, John L. Hosack, Eugene J. Chiarelli, Terry J. Mollica, Atwood, Knox, Anderson, Uzzi & Dinapoli and Robert Knox as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**AGLIANO, P. J.**—Plaintiffs Lick Mill Creek Apartments and Prometheus Development Company, Inc., appeal from a judgment of dismissal entered

after the trial court sustained, without leave to amend, the demurrer of defendants Chicago Title Insurance Company and First American Title Insurance Company to plaintiffs' first amended complaint. The trial court determined, based on undisputed facts alleged in the complaint, that title insurance policies issued by defendants did not provide coverage for the costs of removing hazardous substances from plaintiffs' property. For the reasons stated below, we conclude the trial court's ruling was correct and affirm the judgment.

### Scope of Review

"A general demurrer presents the same question to the appellate court as to the trial court, namely, whether the plaintiff has alleged sufficient facts to justify any relief, notwithstanding superfluous allegations or claims for unjustified relief. [Citations.] '[T]he allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452.)' [Citation.] Pleading defects which do not affect substantial rights of the parties should be disregarded. [Citations.] [¶] In evaluating a demurrer, we assume the truth of all material facts properly pleaded in the complaint unless they are contradicted by facts judicially noticed [citations] but no such credit is given to pleaded contentions or legal conclusions. [Citations.] Specific factual allegations modify and limit inconsistent general statements. [Citations.]" (*B & P Development Corp.* v. *City of Saratoga* (1986) 185 Cal.App.3d 949, 952-953 [230 Cal.Rptr. 192].)

### The First Amended Complaint

The first amended complaint alleges the following material facts:

The real property which is the subject of this case comprises approximately 30 acres of land near the Guadalupe River in Santa Clara County. Prior to 1979, various corporations operated warehouses and/or chemical processing plants on the property. Incident to this use of the property, the companies maintained underground tanks, pumps, and pipelines for the storage, handling, and disposal of various hazardous substances. These hazardous substances eventually contaminated the soil, subsoil, and groundwater.

In 1979, Kimball Small Investments 103 (KSI) purchased the property. Between 1979 and 1981, the California Department of Health Services ordered KSI to remedy the toxic contamination of the property. KSI, however, did not comply with this order.

In early October 1986, plaintiffs acquired lot 1 of the property from KSI. In connection with this acquisition, plaintiffs purchased title insurance from Chicago Title Insurance Company (Chicago Title). The insurance policy issued was of the type known as an American Land Title Insurance Association (ALTA) policy (policy 1). Prior to issuing this policy, Chicago Title commissioned a survey and inspection of the property by Carroll Resources Engineering & Management (Carroll Resources).

Plaintiffs subsequently purchased lots 2 and 3 from KSI and secured two additional ALTA policies (policies 2 and 3) from Chicago Title and First American Title Insurance Company (First American). The entire site was surveyed and inspected. During its survey and inspection, Carroll Resources noted the presence of certain pipes, tanks, pumps, and other improvements on the property. At the time each of the policies was issued, the Department of Health Services, the Regional Water Quality Control Board, and the Santa Clara County Environmental Health Department maintained records disclosing the presence of hazardous substances on the subject property.

Following their purchase of the property, plaintiffs incurred costs for removal and clean-up of the hazardous substances in order "to mitigate plaintiffs' damages and avoid costs of compliance with government mandate." Then, claiming their expenses were a substitute, i.e., a payment made under threat of compulsion of law, for restitution to the State Hazardous Substance Account (Health & Saf. Code, § 25300 et seq.) and "response costs" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 et seq.), plaintiffs sought indemnity from defendants for the sums expended in their cleanup efforts. Defendants, however, denied coverage.

*Discussion*

I. *The Nature of Title Insurance*

"Title insurance is an exclusively American invention. It involves the issuance of an insurance policy promising that if the state of the title is other than as represented on the face of the policy, and if the insured suffers loss as a result of the difference, the insurer will reimburse the insured for that loss and any related legal expenses, up to the face amount of the policy." (Burke, Law of Title Insurance (1986) § 1.1, p. 2.)

Pursuant to Insurance Code section 12340.1, " '[t]itle insurance' means insuring, guaranteeing or indemnifying owners of real or personal property

or the holders of liens or encumbrances thereon or others interested therein against loss or damage suffered by reason of: [¶] (a) Liens or encumbrances on, or defects in title to said property; [¶] (b) Invalidity or unenforceability of any liens or encumbrances thereon; or [¶] (c) Incorrectness of searches relating to the title to real or personal property." Thus, under both the traditional concept and the statutory definition, title insurance covers matters affecting title.

■ Essentially two types of title insurance policies are available to owners of real property interests in California: California Land Title Association standard coverage (CLTA) policies and American Land Title Association (ALTA) policies. CLTA insures primarily against defects in title which are discoverable through an examination of the public record. (Hosack, Cal. Title Insurance Practice (Cont.Ed.Bar 1980) pp. 38-41, § 3.7) Thus, a CLTA policy insures against loss incurred if the insured interest is not vested as shown in the policy; loss from defects in or liens or encumbrances on the title; unmarketability of title; and loss due to lack of access to an open street or highway under certain circumstances. (*Ibid.*) A CLTA policy also covers a limited number of off-record risks. (*Ibid.*) The ALTA policy, such as those purchased by plaintiffs here, provides greater coverage than the CLTA policy. (*Id.* at p. 35, § 3.2.) Generally, it additionally insures against "off-record defects, liens, encumbrances, easements, and encroachments; rights of parties in possession or rights discoverable by inquiry of parties in possession, and not shown on the public records; water rights, mining claims, and patent reservations; and discrepancies or conflicts in boundary lines and shortages in areas that are not reflected in the public records." (*Id.* at p. 36, § 3.3.) Since an ALTA policy covers many off-record defects in title, the insurer will typically survey the property to be insured. (See *Contini* v. *Western Title Insurance Company* (1974) 40 Cal.App.3d 536, 543-544 [115 Cal.Rptr. 257].)[1]

II. *Construction of Language in Insurance Policies*

■ The insuring clauses of an insurance policy define and limit coverage. (*Glavinich* v. *Commonwealth Land Title Ins. Co.* (1984) 163 Cal.App.3d 263, 270 [209 Cal.Rptr. 266].) Where a reviewing court is required to interpret an insurance policy without extrinsic evidence, the question is one of law. (*Aerojet-General Corp.* v. *Superior Court* (1989) 211 Cal.App.3d 216,

[1]Some title companies also offer an environmental protection lien endorsement (ALTA Form 8.1). (Hosack, Cal. Title Insurance Practice (Cont.Ed.Bar Supp. 1987) § 3.9., p. 35) It provides coverage against any recorded environmental protection liens which have not been excluded from coverage. (*Ibid.*) The endorsement also lists state statutes which could create a lien in the future. (*Ibid.*)

224 [258 Cal.Rptr. 684].) Any ambiguity arising from policy language should be resolved in favor of the insured. (*Insurance Co. of North America v. Sam Harris Constr. Co.* (1978) 22 Cal.3d 409, 412-413 [149 Cal.Rptr. 292, 583 P.2d 1335].) However, this rule of construction applies only when the policy language is unclear. (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [54 Cal.Rptr. 104, 419 P.2d 168].) " 'A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citation.]" (*Delgado v. Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271 [203 Cal.Rptr. 672].) Whether language in a contract is ambiguous is a question of law. (*Id.* at p. 270.)

Here the insuring clauses of policies 1, 2, and 3 are identical and provide the following: "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF [THE INSURER] INSURES, AS OF DATE OF POLICY SHOWN IN SCHEDULE A, AGAINST LOSS OR DAMAGE, NOT EXCEEDING THE AMOUNT OF INSURANCE STATED IN SCHEDULE A, AND COSTS, ATTORNEYS' FEES AND EXPENSES WHICH THE COMPANY MAY BECOME OBLIGATED TO PAY HEREUNDER, SUSTAINED OR INCURRED BY THE INSURED BY REASON OF: [¶] (1) TITLE TO THE ESTATE OR INTEREST DESCRIBED IN SCHEDULE A BEING VESTED OTHERWISE THAN AS STATED THEREIN; [¶] (2) ANY DEFECT IN OR LIEN OR ENCUMBRANCE ON SUCH TITLE; [¶] (3) LACK OF A RIGHT OF ACCESS TO AND FROM THE LAND; OR [¶] (4) UNMARKETABILITY OF SUCH TITLE."

## III. *Marketability of Title*

Plaintiffs first contend the policies in the instant case expressly insured that title to the subject property was marketable and, since the presence of hazardous substances on the property impaired its marketability, defendants were obliged to pay cleanup costs. Plaintiffs' position, however, is dependent upon their view that California courts have adopted a definition of marketable title that encompasses the property's market value. Our review of relevant authority establishes no support for this position.

In *Mertens v. Berendsen* (1931) 213 Cal. 111, 112 [1 P.2d 440], the plaintiff attempted to rescind a real estate purchase contract, claiming that the property encroached upon the street and rendered the title defective. (*Id.* at p. 113.) In considering this issue, the court defined marketability of title as follows: " 'Such a title must be free from reasonable doubt, and such that a reasonably prudent person, with full knowledge of the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such

transactions, be willing to accept and ought to accept. It must be so far free from defects as to enable the holder, not only to retain the land, but possess it in peace, and, if he wishes to sell it, to be reasonably sure that no flaw or doubt will arise to disturb its market value. But a mere suspicion against the title or a speculative possiblity that a defect in it might appear in the future cannot be said to render a title unmarketable. It is not required to be free from mere shadows or possiblities, but from probabilities. Moral, not mathematical, certainty that the title is good is all that is required.' " (*Ibid.*, quoting from *Kenefick* v. *Schumaker* (1917) 64 Ind.App. 552 [116 N.E. 319, 323].) Plaintiffs focus on the court's reference to the market value of the property. What plaintiffs ignore, however, is the fact that the court made this reference only in the context of examining an alleged defect in title. *Mertens* does not stand for the proposition that a defect in the physical condition of the land itself renders the title unmarketable.

The case of *Hocking* v. *Title Ins. & Trust Co.* (1951) 37 Cal.2d 644 [234 P.2d 625, 40 A.L.R.2d 1238], further illustrates the distinction between marketability of title and marketability of the land. In *Hocking*, the plaintiff purchased unimproved property and received a grant deed, describing it as two lots in a particular block according to a recorded subdivision map. However, because the subdivider had not complied with various local ordinances regarding subdivision of land, the city would not issue building permits until the plaintiff complied with the ordinances. The plaintiff sought damages from the title insurer claiming defective title.

The *Hocking* court noted the distinction between the land and its title: "It is defendants' position that plaintiff confuses title with physical condition of the property she purchased and of the adjacent streets, and that 'One can hold perfect title to land that is valueless; one can have marketable title to land while the land itself is unmarketable.' The truth of this proposition would appear elementary. It appears to be the condition of her *land* in respect to improvements related thereto (graded and paved streets), rather than the condition of her *title* to the land, which is different from what she expected to get." (37 Cal.2d at p. 651; italics in original.) Thus, the court held that the owner's inability to make economic use of the land due to the subdivider's violations of law did not render the title defective or unmarketable within the terms of the title insurance policy. "Although it is unfortunate that plaintiff has been unable to use her lots for the building purposes she contemplated, it is our view that the facts which she pleads do not affect the marketability of her *title* to the land, but merely impair the market *value* of the property. She appears to possess fee simple title to the property for whatever it may be worth; if she has been damaged by false representations in respect to the condition and value of the land her remedy would seem to be against others

than the insurers of the title she acquired." (37 Cal.2d at p. 652, italics in original.) Similarly, here plaintiffs have pled facts relating to marketability of the land rather than marketability of title.

Other jurisdictions have also recognized the distinction. In *Chicago Title Ins. Co.* v. *Kumar* (1987) 24 Mass.App. 53 [506 N.E.2d 154, 156], the defendant had purchased property on which hazardous substances were discovered. The defendant sought payment for cleanup costs from its title insurer. (*Ibid.*) The insurer sought a declaration as to its obligations under the policy. The defendant owner filed a counterclaim, seeking a declaration that the presence of hazardous substances constituted a defect in title and the state's statutory power to impose a lien to secure payment of cleanup costs rendered his title unmarketable. (*Ibid.*) Relying on *Hocking* v. *Title Ins. & Trust Co.*, *supra*, 37 Cal.2d 644, 651, the court found in favor of the insurer, stating "the defendant confuses economic lack of marketability, which relates to physical conditions affecting the use of the property, with title marketability, which relates to defects affecting legally recognized rights and incidents of ownership. . . . The presence of hazardous material may affect the market value of the defendant's land, but, on the present record [since no lien had been recorded], it does not affect the title to the land." (506 N.E.2d at p. 157.)

Plaintiffs attempt to distinguish *Kumar* on the ground that here they purchased ALTA policies while the defendant in *Kumar* purchased a CLTA policy.[2] They point out an ALTA policy which required a physical inspection and survey of the property would have insured against off-record risks and potential liens not covered by a CLTA policy. While an ALTA policy provides greater coverage than a CLTA policy, it does not follow that an ALTA policy extends coverage to matters not affecting title. We must still examine the policy language for a determination of coverage. Here the policy insures against "unmarketability of title." The definition of this term is not dependent upon the type of title insurance policy in which it appears.

We find no ambiguity in the insuring clause: defendants are obligated to insure plaintiffs against unmarketability of title on the subject property. Because marketability of title and the market value of the land itself are separate and distinct, plaintiffs cannot claim coverage for the property's physical condition under this clause of the insurance policies.

[2]Plaintiffs did not purchase an environmental protection endorsement (ALTA form 8.1 policy).

## IV. Encumbrance on Title

■ The policies in question insure plaintiffs against "any defect in or lien or encumbrance" on title. Although no lien had been recorded or asserted at the time the title insurance policies were issued, plaintiffs contend the presence of hazardous substances on the property constituted an encumbrance on title.

Encumbrances are defined by statute as "taxes, assessments, and all liens upon real property." (Civ. Code, § 1114.) Where a property is contaminated with hazardous substances, a subsequent owner of the property may be held fully responsible for the financial costs of cleaning up the contamination. (42 U.S.C. § 9607(a); Health & Saf. Code, §§ 25323.5, 25363.) A lien may also be imposed on the property to cover such cleanup costs. (42 U.S.C. § 9607(*l*).) Plaintiffs reason that because any transfer of contaminated land carries with it the responsiblity for cleanup costs, liability for such costs constitutes an "encumbrance on title" and is covered. We disagree.

In *United States* v. *Allied Chemical Corp.* (N.D. Cal. 1984) 587 F.Supp. 1205, the plaintiff alleged a breach of warranty that property conveyed was free of encumbrance where hazardous substances were present on the property at the time it was conveyed. The court dismissed the plaintiff's cause of action, stating: "Plaintiff argues that the term 'encumbrance' is broad enough to include the presence of hazardous substances. However, the only authorities cited have interpreted 'encumbrance' to include only liens, easements, restrictive covenants and other such interests in or rights to the land held by third persons. (*See Evans* v. *Faught*, 231 Cal.App.2d 698, 706 . . . .) Plaintiff has given no authority establishing its broad argument that any physical condition, including the presence of hazardous substances, is an 'encumbrance' if 'not visible or known' at the time of conveyance. [¶] The court declines to interpret 'encumbrance' as broadly as plaintiff urges. The court finds that, under current law, the term 'encumbrance' does not extend to the presence of hazardous substances alleged in this case." (*Id.* at p. 1206.) (Accord *Cameron* v. *Martin Marietta Corp.* (E.D.N.C. 1990) 729 F.Supp. 1529, 1532.)

In *Chicago Title Ins. Co.* v. *Kumar, supra,* 506 N.E.2d 154, the court also held that the presence of hazardous substances on the land at the time title was conveyed did not constitute an encumbrance. "The mere possibility that the Commonwealth may attach a future lien . . . , as a result of the release of hazardous material (existing but unknown at the time a title insurance policy is issued) when the Commonwealth has neither expended moneys on the property requiring reimbursement nor recorded the necessary statement

of claim, is insufficient to create a 'defect in or lien or encumbrance on . . . title.' " (*Id.* at p. 156.)

In *South Shore Bank* v. *Stewart Title Guar. Co.* (D.Mass. 1988) 688 F.Supp. 803, the plaintiff sought a declaration that the title insurance company was liable for the cleanup costs related to hazardous substances on the property where there was no recorded lien at the time the policy was issued. The court held as a matter of law there was no coverage under the policy, stating "[p]laintiff has neither alleged nor offered any facts to show a defect in title. Hence, it has no cause of action against [the title insurer]." (*Id.* at p. 806.)

In *Holmes* v. *Alabama Title Co., Inc.* (Ala. 1987) 507 So.2d 922, the landowners' parcels contained an abandoned coal mine. Surface fractures began to appear, indicating that methane gas might eventually escape. The landowners brought suit against their title insurers and others. The reviewing court found in favor of the insurers, reasoning: "The purpose of title insurance is not to protect the insured against loss arising from physical damage to property; rather, it is to protect the insured against defects in the title." (*Id.* at p. 925.) (Accord *Title & Trust Co. of Florida* v. *Barrows* (Fla. Dist.Ct.App. 1979) 381 So.2d 1088, 1090; *Mafetone* v. *Forest Manor Homes, Inc.* (1970) 34 A.D.2d 566 [310 N.Y.S.2d 17, 18]; *Edwards* v. *St. Paul Title Ins. Co.* (1977) 39 Colo.App. 235 [563 P.2d 979, 980].)

Plaintiffs rely upon a broad definition of "encumbrance" in dictum in *American Title Co.* v. *Anderson* (1975) 52 Cal.App.3d 255 [125 Cal.Rptr. 24]. In that case, the dispute involved title to a particular piece of property. The title insurer sought to recover, by means of subrogation, money it had paid a third party. The trial court granted summary judgment in favor of the title insurer. The appellate court reversed. We first note that the *American Title* court interpreted "encumbrance" as any right to or interest in land, not the condition of the land itself. (*Id.* at pp. 258-259.) Moreover, American Title did not involve the liability of a title insurance company to the owner of property on which hazardous substances are present when the policy is issued absent a recorded lien.

Plaintiffs next focus on a definition of encumbrance which "includes within its scope a lien as well as any other right or interest held by a third party that is not extinguished by the transfer of the estate and that diminishes the value of the property. [Fn. omitted.]" (Barnes & Salter, *A Practical Guide to Title Insurance in California,* 8, No. 4 Cal. Real Property J. (Fall 1990)

p. 5.) In the instant case, however, no third party holds a right or interest in the subject property.

## V. *Exclusions in Policies 1 and 3*

Plaintiffs contend the governmental regulation and police power exclusions included in policies 1 and 3 are inapplicable.[3] We need not decide this question, since we have found no coverage under the identical insuring clauses of each policy.

Plaintiffs also contend they had a reasonable expectation that cleanup costs would be covered by the policies, because policies 1 and 3 did not include environmental exclusions as did policy 2.[4]

 Where there is ambiguity in the language of an insurance policy, a court will interpret coverage so as to protect the objectively reasonable expectations of the insured. (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

As previously discussed, the language of the insuring clauses of all three policies unambiguously provides coverage only for defects relating to title. These clauses make no reference to the physical condition of the land. Moreover, this interpretation is fully supported by relevant authority. Under these circumstances, we fail to see how a specific exclusion in one policy leads to a reasonable expectation of coverage in the insuring clauses of other policies.

---

[3]Policies 1 and 3 contain exclusions from coverage as follows: "Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions or area of the land, or the effect of any violation of any such law, ordinance or governmental regulation." The police power exclusion states as follows: "Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy."

[4]Policy 2 stated in relevant part: "The following matters are expressly excluded from the coverage of this policy: . . . . [¶] (b) Any law, ordinance or governmental regulation relating to environmental protection. . . . [¶] (d) The effect of any violation of the matters excluded under (a), (b) or (c) above, unless notice of a defect, lien or encumbrance resulting from a violation has been recorded at Date of Policy in those records in which under state statutes, deeds, mortgages, lis pendens, liens or other title encumbrances must be recorded in order to impart constructive notice to purchasers of the land for value and without knowledge; provided, however, that without limitation, such records shall not be construed to include records in any of the offices of federal, state or local environmental protection, zoning, building, health or public safety authorities."

*Disposition*

The judgment is affirmed.

Capaccioli, J., and Bamattre-Manoukian, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 29, 1991.